UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARRELL JONES,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

**21 Civ. 6465 (NSR)**
**19 Cr. 35 (NSR)**

**MEMORANDUM OF LAW IN OPPOSITION TO DARRELL JONES' PETITION PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT HIS SENTENCE**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Samuel Raymond
Assistant United States Attorney
*Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 2
PROCEDURAL BACKGROUND ........ 2
STATEMENT OF FACTS ........ 11
LEGAL STANDARDS ........ 16
ARGUMENT ........ 21
A. The Court Should Deny Jones' *Brady* Claim ........ 22
1. The Government Did Not Suppress Exculpatory Information ........ 22
2. Jones Waived His Right to Attack His Conviction ........ 27
3. Jones' *Brady* Claim as to Certain Allegations is Untimely ........ 30
B. Jones' Ineffective Assistance of Counsel Claim is Untimely and Without Merit ........ 33
1. The Ineffective Assistance of Counsel Claim is Untimely ........ 34
2. Jones Has not Shown Ms. Brody Acted Ineffectively By Not Filing Motions to Suppress ........ 34
3. Jones Suffered No Prejudice from Ms. Brody's Representation ........ 40
C. Jones' Other Claims are Untimely and Meritless ........ 42
CONCLUSION ........ 44

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to Darrell Jones' *pro se* petition to vacate, set aside, or correct his sentence (the "Petition"). Jones principally argues that the Government failed to disclose exculpatory material, as it was required to under *Brady v. Maryland*; that he received ineffective assistance of counsel; and that the evidence against him should have been suppressed for sundry reasons.

The Court should deny the Petition in full, because the Government did not suppress exculpatory information; Jones received effective assistance of counsel; and Jones's claims otherwise are untimely, procedurally defaulted, or fail on their merits.

## PROCEDURAL BACKGROUND

*Pre-Plea Proceedings*

On December 19, 2018, Magistrate Judge Lisa M. Smith signed an arrest warrant and complaint, based on an affidavit from Mount Vernon Police Department Detective and Drug Enforcement Administration Task Force Officer Johanna Santos, charging Jones with being a felon-in-possession of a firearm found in his apartment on November 26, 2018. Jones was writted from state custody into federal custody the next day, and ordered detained by Judge Smith.

On January 16, 2019, Jones was charged in indictment 19 Cr. 35 (NSR). The indictment charged Jones with six counts: felon-in-possession of a firearm on or about November 24, 2018 (Count One); felon-in-possession of a firearm in or about November 2018 (Count Two); possession with intent to distribute a detectable amount of heroin on or about July 26, 2018

(Count Three); possession with intent to distribute a detectable amount of heroin on or about August 3, 2018 (Count Four); possession with intent to distribute a detectable amount of heroin in or about November 2018 (Count Five); and possession of a firearm in furtherance of a controlled substance offense, namely that charged in Count Five, in or about November 2018 (Count Six).[1]

Soon thereafter, the Government produced expansive discovery materials, including, as discussed further herein, text messages and recorded calls between an undercover officer and Jones; law enforcement reports by members of the DEA and Mount Vernon Police Department regarding controlled purchases of narcotics from Jones in 2018[2]; multiple video recordings taken by law enforcement officers surveilling the controlled purchases[3]; lab reports analyzing the contents of the products sold by Jones during 2018[4]; Mount Vernon Police Department records

---

[1] As the Court may recall, because Jones initially was in state custody, he was accidentally and temporarily released in mid-February; he was later arrested again without incident on or about March 7, 2019, and remanded back into custody.

[2] Dkt. Nos. 23-2 at 14–16, 23-7 at 34 (report regarding July 26, 2018 controlled purchase), Dkt. Nos. 23-2 at 17–18, 23-7 at 35 (report regarding August 3, 2018 controlled purchase); Dkt. Nos. 23-2 at 93–94, 23-7 at 36 (report regarding August 8, 2018 controlled purchase); Dkt. No. 23-7 at 30–33 (reports regarding May 24, June 14, June 20, July 5, 2018 purchases from Jones).

[3] The video recordings show Jones meeting with the undercover officer, on the relevant dates of the controlled purchases, at the locations listed on the reports.

[4] Dkt. No. 23-7 at 18, 28 (report regarding August 8, 2018 controlled purchase, which showed that the product Jones sold to the undercover on August 8 was in fact not drugs), 20 (report regarding April 2018 controlled purchase), 21 (report regarding June 2018 controlled purchase), 22 (report regarding another controlled purchase), 23 (report regarding another controlled purchase); 24 (report regarding another controlled purchase), 25 (report regarding another controlled purchase), 26 (report regarding July 26, 2018 controlled purchase), 27 (report regarding August 3, 2018 controlled purchase).

describing the circumstances of Jones' November 24, 2018 arrest by officers with the Mount Vernon Police Department[5]; a November 26, 2018 search warrant affidavit for Jones' residence located at 40 East Sidney Avenue Apartment 10 N in Mount Vernon, which was signed by Detective Camilo Antonini[6]; the search warrant for Jones' apartment signed by the state judge[7]; and the reports and photographs from the officers and agents who searched Jones' apartment on November 26, 2018.[8] The Government produced copies of discovery to both Jones' counsel, Federal Defender Susanne Brody, Esq., and to Jones himself at the Westchester County Jail.

On April 9, 2019, the Government sent a *Pimentel* letter to Ms. Brody, calculating the application of the U.S. Sentencing Guidelines were Jones to plead guilty to Count Two through Six.[9] In this *Pimentel* letter, the Government stated that Jones faced a mandatory minimum of 240 months' imprisonment, and were he to plead guilty, a Sentencing Guidelines range of 262 to 327 months' imprisonment. On April 17, 2019, the Court held a status conference, and set

---

[5] Dkt. No. 23-5 at 15–18.

[6] Dkt. No. 23-6 at 2–6.

[7] Dkt. No. 23-6 at 7–8.

[8] Dkt. Nos. 23-6 at 9–11, 23-7 at 15–17 (report by law enforcement officers), 29 (lab report of the items found at search).

[9] Ms. Brody had previously expressed to Government counsel her contention that she was considering whether to move to suppress the firearm seizure underlying Count One, so the *Pimentel* provided the Guidelines for just the other counts. Additionally, in an email the following day, the Government described the calculation as a "rough estimate" and not necessarily the Government's "litigating position," given lingering legal uncertainty about whether Jones' prior criminal history meant he was an Armed Career Criminal under 18 U.S.C. § 924 and the recent Supreme Court decisions interpreting the statute, or a Career Offender under U.S.S.G. § 4B1.1 and the recent Second Circuit decisions interpreting the Guideline.

another conference date for May 15, 2019. The Court determined that if no disposition was reached by the next status conference, the Court would set a briefing schedule on evidentiary motions.

*Plea Proceedings*

Instead, on May 9, 2019, Jones appeared before Judge Smith, waived indictment and consented to lodging of a superseding felony information, charging him with possession with intent to distribute more than 100 grams of heroin in or about November 2018 (Count One) and possession of a firearm in furtherance of a drug trafficking crime in or about November 2018 (Count Two), offenses that collectively carried a mandatory minimum of 120 months. On that date, Jones pleaded guilty to both counts on the Information, pursuant to a plea agreement (the "Plea Agreement") (the Plea Agreement is enclosed herein as Ex. A).[10] In the Plea Agreement, besides the charges to which Jones was pleading to, the Government agreed to not prosecute Jones for distributing quantities of heroin on or about July 26 and August 3, 2018, possessing a firearm on the streets of Mount Vernon on or about November 24, 2018, and possessing a firearm in his home in November 2018. (Ex. A at 2). The Government also agreed to dismiss open counts at Jones' sentencing (Ex. A at 2). Pursuant to the Plea Agreement, Jones and the Government agreed that neither party would appeal or collaterally attack a sentence of 327

---

[10] The Government has not been able to find in its records the final signed and counter-signed copy of the Plea Agreement; however, the Government has confirmed that the copy enclosed as Exhibit A is the version sent to Judge Smith in advance of the hearing and that Jones signed and allocuted to at the plea hearing. (Plea Transcript, May 9, 2019, at 11 ("I have before me a plea agreement dated April 18")).

months or below (Ex. A at 7). Jones also agreed that "by entering his plea of guilty," he "waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of" the Plea Agreement. (Ex. A at 8).

During the plea proceeding, the defendant stated the following under oath, among other things, in response to the Court's questions:

- When asked if he was satisfied with his counsel's representation of him, he said, "Yes, Your Honor." (Plea Transcript, May 9, 2019, at 10).
- When asked if he was satisfied that he understood "the entire plea agreement," the Plea Agreement, and that he had reviewed it with his counsel, he responded each time, "Yes." (*Id.* at 11).
- When asked if the Plea Agreement contained the "complete understanding" between the defendant, his counsel, and the Government, the defendant said, "Yes." (*Id.* at 12).
- When asked if he had signed the plea agreement freely and voluntarily, the defendant said "Yes, Your Honor." (*Id.* at 13).
- When asked if anyone had threatened, forced, or coerced him to plead guilty, Jones responded "No, Your Honor." (*Id.* at 13).

- When asked if he understood that the maximum sentence under Count One of the Information was 40 years, the maximum term of imprisonment under Count Two was life, that each count carried a five year mandatory minimum, and that the sentence on Count Two must run consecutively to the sentence imposed on Count One, the defendant said he understood. (*Id.* at 13–15).
- When asked if he understood that, pursuant to the Plea Agreement, he was waiving his right to challenge, through an appeal or otherwise, any sentence within or below the stipulated Guidelines range of 262 to 327 months' imprisonment, he said he understood. (*Id.* at 21).
- When asked if he understood that, pursuant to the Plea Agreement, he was "giving up other rights that you might have had to appeal or otherwise attack the sentence imposed by the Court," the defendant said he understood. (*Id.* at 21–22).
- When asked what he did to make him guilty, Jones responded:
    - "In and around November 2018, I intentionally and knowingly possessed with intent to distribute more than 100 grams of heroin. I knew this was a crime and illegal. This took place in Mount Vernon, New York. Count Two. In connection with my drug trafficking, I knowingly possessed a firearm. I knew this was a crime and illegal. Again, this was in the city of Mount Vernon, New York." (*Id.* at 27–28).
    - Jones agreed, after further questions from the Court, that he had possessed "the firearm in order to protect and maintain the narcotics." (*Id.* at 28). He

also agreed that he had possessed "approximately 300 grams of substances containing heroin," and that it was his intention to distribute those substances. (*Id.* at 28).

*Sentencing Proceedings*

The Court adjourned sentencing, at the defendant's request, from October to December 12, 2019. Jones submitted a sentencing memorandum on November 27, 2019, Dkt. No. 17. In the memorandum, Jones' counsel, now Federal Defender Benjamin Gold, Esq., argued on Jones' behalf that the Court should impose a sentence at the statutory mandatory minimum, 120 months', based on Jones' difficult childhood, lifelong drug abuse, age, and need for treatment and job vocational training. Jones' submission also included numerous letters from Jones' family and friends, as well as, filed on December 6, 2019, a letter from Jones himself. On December 2, 2019, the Government filed its sentencing submission, which argued for a sentence within the Guidelines. Dkt. No. 18.

Sentencing proceeded on December 12, 2019. The Court asked if the defendant or his counsel had any objections to the pre-sentence report; Mr. Gold and the defendant both said they did not. (Sentencing Tr. December 12, 2019 at 3–4). The Court then allowed both sides to make arguments about the proper sentence, and ultimately imposed a sentence of 180 months' imprisonment, within the Stipulated Guidelines Range set forth in the Plea Agreement. Judgment was entered that day, December 12, 2019, and no appeal was filed.

*Detective Sean Fogarty's Plea to Perjury Charge*

Two weeks later, Detective Sean Fogarty of the Yonkers Police Department pleaded guilty to perjury in Manhattan state court, based upon his false testimony to a grand jury regarding the location of drugs that were seized during a search in April 2018 of the building in which Calvin Powell, an narcotics suspect wholly unconnected from Jones, lived.[11] The Government understands that the Calvin Powell search involved a state narcotics search warrant for the first and second floors of a three-story residence. The issue arose because one of the locations from which a substantial amount of drugs were seized was a closet which was on the third floor of the target building, a location outside the scope of the search warrant.

Detective Fogarty had been a member of the Westchester County DEA task force that investigated Darrell Jones and had participated in some of the controlled purchases of narcotics from Jones in 2018. In addition, around the same time as Fogarty's guilty plea in December 2019, Powell filed suit against Detective Fogarty, Detective Santos, and others who allegedly were involved in the search of Powell's residence. *Powell v. United States of America*, 19 Civ. 11351 (S.D.N.Y.) (AKH), Dkt. No. 1 (filed Dec. 11, 2019). According to Jones' own filing, which included communications between himself and Mr. Gold, he called the Federal Defenders' office soon after the lawsuit was filed and Detective Fogarty pleaded guilty, requesting more

---

[11] Details concerning this search are set forth in a disclosure letter the Government made, pursuant to a protective order, in another, completely unrelated, case, where there was a closer correspondence between the investigators in that case and the investigators as to whom allegations stemming from the Calvin Powell search had been made. The Government has included that letter in its separate, sealed, *ex parte* submission to the Court in this matter.

information about Detective Fogarty after he had read an article in the New York Post, and to request from Mr. Gold "any information regarding" Detective Antonini. (Dkt. No. 23 at 12–13). Mr. Gold wrote back in a letter dated January 24, 2020, stating that he had "examined the discovery from your case, and it does not appear that Officer Fogarty was very involved in your case, but you should tell me if that is incorrect." (Dkt. No. 23-2 at 3–4). In response to an apparent question from Jones regarding Detective Antonini, who had been the affiant on the November 26, 2018 search warrant, Mr. Gold mailed to Jones news reports regarding civil lawsuits that had been filed against Mount Vernon connected to Detective Antonini.[12]

*Jones's Petition*

Jones filed the Petition on July 21, 2021, and the Court docketed the Petition on July 29, 2021. His Petition included the aforementioned correspondence with Mr. Gold; discovery materials from the instant case and prior cases; certain news articles regarding Detective Fogarty and the civil complaint filed by Calvin Powell against the United States; news articles regarding Detective Antonini from March and June 2020; and an affidavit by Derrick Crenshaw making certain factual statements regarding the circumstances of Jones' November 2018 arrest.

Construing the defendant's *pro se* habeas petition liberally, Jones appears to raise the following grounds for relief, which are somewhat overlapping:[13] (1) that the Government

---

[12] The allegations concerning Detective Antonini, discussed at greater length below, are not related to the Calvin Powell search.

[13] To the extent the Court identifies additional grounds for relief in the defendant's submission not addressed by the Government herein, the Government respectfully requests an opportunity to respond to those grounds.

suppressed *Brady* information by failing to disclose the allegations against Detective Fogarty, Detective Santos, and the ongoing investigations into Detective Antonini[14]; (2) that the gun recovered from his person on November 24, 2018 should be suppressed[15]; (3) that the evidence recovered from Jones' apartment on November 26, 2018 should be suppressed[16]; (4) that the indictment should be dismissed because the Government committed misconduct before the grand jury[17]; (5) that Ms. Brody provided him ineffective assistance of counsel by, *inter alia*, failing to investigate, file motions or briefs[18]; and (6) that the indictment should be dismissed because the chain of custody for the narcotics which Jones sold to the undercover officers and seized from the Jones' apartment was tainted.[19]

## STATEMENT OF FACTS

Had this case gone to trial, and based on the investigative reports, photos, video, and audio received from the law enforcement agents who investigated this case, the Government expects that the evidence would have established the following. The Government sets forth this expected evidence in some detail in order to describe the nature of the enforcement operations against Darrell Jones and the role in those operations of the investigators as to whom Jones alleges impeachment information was withheld. Specifically, in the spring and summer of 2018,

---

[14] Dkt. No. 23 at 5–15.

[15] Dkt. No. 23 at 17–37.

[16] Dkt. Nos. 23 at 40, 23-1 at 1–19.

[17] Dkt. No. 23-1 at 20–22.

[18] Dkt. No. 23-1 at 23.

[19] Dkt. No. 23-1 at 25–28.

the Mount Vernon Police Department, assisted by the DEA, performed numerous controlled purchases of heroin from Darrell Jones, using an undercover officer. The same undercover officer was used in all of the controlled purchases. After the undercover met with Jones, the substances which Jones provided to the undercover were brought to the Westchester County Crime Lab soon after; on all but one occasion, the substances tested positive for the presence of heroin or fentanyl. The undercover would contact Jones right before the meetings to confirm the time, place, and sometimes, the quantity and prices; many of the text messages between the two were saved and the calls often recorded. Each meeting was surveilled by multiple members of law enforcement, and the meetings were video recorded. The recordings show the undercover meeting with Jones at the agreed-upon time and place.

Three of these meetings occurred on July 26, 2018, August 3, 2018, and August 8, 2018. (Presentence Report ("PSR") ¶ 10). On the first two occasions, Jones sold what was later determined to be 10 and then 20 grams of heroin to the undercover officer; on the third date, he sold what he represented to be 30 grams of heroin but was in fact not narcotics at all. (PSR ¶ 10). Numerous law enforcement officers participated in the surveillance and in other parts of the operations on July 26, August 3, and August 8. Those officers included Detective Fogarty, Santos, Antonini, Special Agents Edward Maher (then the Acting Group Supervisor of the team, who approved the DEA reports regarding the controlled purchases) and Joseph Tamweber, other Task Force Officers with the DEA, and at least one other member of local law enforcement.

*July 26, 2018 Undercover Buy*

On July 26, Jones and the undercover agreed to meet around 3 PM at a parking garage close to Jones' residence at 40 East Sidney Avenue in Mount Vernon.[20] Law enforcement performed surveillance outside Jones' residence. At about 3:20 P.M., Detective Camilo Antonini observed Jones standing outside the apartment building.[21] The video recording shows Jones entering the parking garage, and then entering the undercover's car.[22] Jones stayed for a few minutes talking, and then exited. Afterwards, the undercover provided the substances which he said Jones gave him to Detective Antonini, in the presence of Detective Johanna Santos.[23] Detective Antonini then delivered the drugs to the Westchester Lab, where they later tested positive for the presence of heroin.[24]

[20] The Government produced the call between the undercover and Jones on or about March 19, 2019, in a file entitled "UC Controlled Call for UC BUY WALK ON JULY 26.wav," in a folder numbered USAO_000118. The Government produced text message exchanges between the undercover and Jones setting up this meeting as USAO_000186, on or about March 19, 2019.

[21] Dkt. No. 23-2 at 14.

[22] The Government produced this video in a file entitled "UC BUY ON JULY 26 2018.MTS" under a folder numbered USAO_000118 on or about March 19, 2019. In preparing this Opposition, the Government obtained, for the first time, audio files of the July 26, 2018 controlled purchase which were in the custody of the Westchester County Police Department, from a recording system used by the undercover. Those files further corroborate that Jones provided the undercover with substances that day.

[23] Dkt. No. 23-2 at 15.

[24] Dkt. Nos. 23-2 at 15, 23-7 at 26.

*August 3, 2018 Undercover Buy*

On August 2, the undercover called Jones, and arranged for another meeting to occur the following day; the undercover agreed to buy 20 grams of heroin for $65 a gram, at 7 P.M.[25] The next day, the undercover confirmed with Jones that the two should meet. Once again, the undercover was sitting in his car in the garage close to 40 E. Sidney, and law enforcement performed surveillance outside Jones' residence.[26] At about 7:15 P.M., Detective Antonini observed Jones exiting 40 E. Sidney.[27] The video recording of this purchase is more difficult to see because of how dark it is,[28] but agents reported that Jones was observed walking into the garage, where he handed something to the undercover through the window of the undercover's car.[29] He was then observed walking out of the garage.[30] The undercover provided the substances to Detective Antonini, observed by Detective Santos.[31] Law enforcement then

[25] The Government produced this call in a file entitled "DW_A0316.wav" in a folder numbered USAO_000053 on or about March 19, 2019.

[26] Dkt. No. 23-2 at 17–18.

[27] Dkt. No. 23-2 at 17–18.

[28] The Government produced this video in a file entitled "08032018.MTS" under a folder numbered USAO_000118 on or about March 19, 2019. In preparing this Opposition, the Government obtained, for the first time, audio files of the August 3, 2018 controlled purchase which were in the custody of the Westchester County Police Department, from a recording system used by the undercover. Those files further corroborate that Jones provided the undercover with substances that day.

[29] Dkt. No. 23-2 at 17–18.

[30] Dkt. No. 23-2 at 17–18.

[31] Dkt. No. 23-2 at 17–18.

brought the substances to the Westchester Crime Lab, where they later tested positive as 20 grams of heroin.[32]

*August 8, 2018, Undercover Buy*

In the days before August 8, the undercover arranged to purchase 30 grams of heroin from Jones.[33] The two agreed to meet on August 8. Once again, the undercover was sitting in his car in the garage close to 40 E. Sidney, and law enforcement performed surveillance outside Jones' residence.[34] At about 6:30, Detective Antonini observed Jones near E. Sidney Avenue.[35] The video recording clearly shows Jones walking up to the undercover's car, entering, staying for a few minutes talking, and then exiting. Jones was then observed walking out of the garage.[36] The undercover provided the substances to Detective Antonini, observed by Detective Santos.[37] Law enforcement then brought the substances to the Westchester Crime Lab, where they tested negative for the presence of any drugs.[38]

---

[32] Dkt. No. 23-7 at 27.

[33] The Government produced a recorded call between the undercover and Jones from August 6, 2018, in which the two arranged to meet soon as "DW_A0317.wav," and a recorded call between the undercover and Jones from August 8, 2018 in which the two arranged to meet in a few hours as "DW_A0319.wav" under a folder numbered USAO_000053 on or about March 19, 2019.

[34] Dkt. No. 23-2 at 19–20.

[35] Dkt. No. 23-2 at 19–20.

[36] Dkt. No. 23-2 at 19–20.

[37] Dkt. No. 23-2 at 19–20.

[38] Dkt. No. 23-7 at 28.

*Jones's November 2018 Arrest and the Search of His Apartment*

A few months later, on or about November 24, 2018, Jones was stopped by Mount Vernon Police Department authorities on the street in Mount Vernon. (PSR ¶ 11). He was arrested on narcotics possession charges, and when arrested, told the police that he was carrying a firearm, which he surrendered. (PSR ¶ 11). Jones was then booked and detained in Westchester County Jail on state charges. On or about November 26, 2018, Detective Antonini applied for and obtained from a Mount Vernon City Judge a search warrant for Jones' apartment. When executing the search of the Jones' apartment, members of the Mount Vernon PD and the DEA found approximately 300 grams of heroin, and an additional firearm, though the receiver and the slide were not assembled together. (PSR ¶ 12).

## **LEGAL STANDARDS**

A prisoner may move to vacate, set aside, or correct his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). However, "[*h*]*abeas* review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quotation marks and citation omitted); *United States v. Frady*, 456 U.S. 152, 165 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal.").

Statute of Limitations

Section 2255 allows a petitioner one year from "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). For purposes of a plea, "an unappealed federal criminal judgment becomes final when the time for filing a direct appeal expires." *Moshier v. United States*, 402 F.3d 116, 118 (2d Cir. 2005). "That occurs 14 days after the entry of judgment." *Robinson v. United States*, No. 18-CR-373 (RJS), 2021 WL 568171, at *3 (S.D.N.Y. Feb. 16, 2021) (citing Fed. R. App. P. 4(b)(1)). The "one-year statute of limitations operates on a claim-by-claim basis." *Guerrero v. United States*, No. 20 CV 4130 (VB), 2021 WL 3172985, at *3 (S.D.N.Y. July 27, 2021) (citing *Davis v. United States*, 817 F.3d 319, 326-28 (7th Cir. 2016); *Zack v. Tucker*, 704 F.3d 917, 926 (11th Cir. 2013)).

Under certain circumstances, the one-year limitations period may be tolled. As applicable here, a defendant may still timely file a Section 2255 petition if he files within one year "from the latest of" either the date that the judgment of conviction became final, or "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). Courts have interpreted Section 2255(f)(4), and the parallel provision of the statute of limitations governing Section 2244 petitions, to focus on "the 'vital facts' underlying the claim," that is, facts "without which the claim would necessarily be dismissed under Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts." *See Garcia v. United States*, No. 1:13-CV-3040-GHW, 2014 WL 6632969, at *6-7 (S.D.N.Y. Nov. 24, 2014) (quoting *Rivas v. Fischer*, 687 F.3d 514, 534-35 (2d Cir. 2012)).

"[N]ew information" "that merely supports or strengthens a claim that could have been properly stated without the discovery" is not sufficient. *Id.*

Similarly, the facts themselves must be newly discovered. "Conclusions drawn from preexisting facts, even if the conclusions are themselves new, are not factual predicates for a claim." *Rivas*, 687 F.3d at 535. The application of Section 2255(f)(4) to a habeas petition is a "'fact-specific' inquiry which requires a district court to analyze the factual bases of each claim and to determine when the facts underlying the claim were known, or could with due diligence have been discovered." *Id.* at 534-35. The petitioner bears the burden to establish that he meets the statutory elements under 28 U.S.C. § 2255(f)(4). *Matera v. United States*, 83 F. Supp. 3d 536, 546 (S.D.N.Y. 2015) ("[I]t is the Petitioner's burden to demonstrate why he was unable to discover the factual predicate of his claim before the date asserted."); *accord Rivas*, 687 F.3d at 535; *see also Lopez-Garcia v. United States*, No. 08 CR 1287 SCR, 2015 WL 745743, at *2 (S.D.N.Y. Feb. 9, 2015).

<u>Disclosure Obligations before Guilty Pleas</u>

The Government has an obligation to disclose material, exculpatory evidence to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In the trial context, such evidence includes not only information that tends to exculpate the accused, but also information useful to impeaching the credibility of a government witness. *Giglio v. United States*, 405 U.S. 150, 154 (1972). "The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government.'"

*United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982) (citing *United States v. Ruggiero*, 472 F.2d 599, 604 (2d Cir.), *cert. denied*, 412 U.S. 939 (1973)).

To establish a *Brady* violation, a defendant must show that (i) the Government suppressed evidence, (ii) the evidence was favorable to the defendant, and (iii) the failure to disclose the evidence resulted in prejudice. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[E]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) (citations and alterations omitted).

Defendants who plead guilty voluntarily, knowingly, and intelligently forgo certain constitutional rights available to defendants who proceed to trial. *See United States v. Ruiz*, 536 U.S. 622, 628-29 (2002). Specifically, defendants are not entitled, pre-plea, to receive impeachment information the Government would need to disclose before a trial witness's testimony. *See id.* at 633 ("[T]he Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."). Further, defendants can choose to waive their rights to *Brady* or *Giglio* information through entering a knowing and voluntary plea to a written agreement with such a waiver. *See, e.g.*, *Colon v. United States*, No. 17 CR. 666 (PKC), 2019 WL 5078600, at *2 (S.D.N.Y. Oct. 10, 2019) ("Further in his plea agreement defendant waived his right to attack his conviction on the basis of a failure to produce *Brady* and *Giglio* material."); *Tremblay v. United States*, No. 05 CR. 0783 (JFK), 2009 WL 1055007, at *8 (S.D.N.Y. Apr. 20, 2009) (*Brady* and *Giglio* waivers in plea

agreements "are enforceable where, as here, the defendant entered into the plea agreement knowingly and voluntarily.").

Procedural Default and *Strickland* Standard

"In the case of a collateral challenge based on constitutional claims, two separate rules regarding claim preclusion based on a prior adjudication apply." *Yick Man Mui v. United States,* 614 F.3d 50, 53 (2d Cir. 2010). The first is the "mandate rule," which bars re-litigation of issues decided on direct appeal, including those issues implicitly resolved by the mandate of the appellate court. *Id.* The second bars claims that could have been brought on direct appeal, absent a showing of "cause" for his failure to raise the issue and "prejudice" from the alleged error. *Id.* at 54. Ineffective assistance of counsel may provide cause and actual prejudice excusing the failure to raise the claim on direct appeal. *Coleman v. Thompson*, 501 U.S. 722, 753–54 (1991); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

A claim of ineffective assistance of counsel fails unless a defendant: (i) overcomes a "strong presumption" that his counsel's conduct was reasonable and shows that his representation "fell below an objective standard of reasonableness" under "prevailing professional norms," and (ii) "affirmatively prove[s] prejudice," that is, shows that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-89, 693-94 (1984); *accord United States v. De La Pava*, 268 F.3d 157, 163 (2d Cir. 2001). The burden is on the defendant to establish both elements. *Strickland*, 466 U.S. at 687.

Under the first prong of *Strickland* analysis, the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way." *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (internal quotation marks and brackets omitted). A defendant cannot prevail on a claim of ineffective assistance merely because he believes that his counsel's strategy was inadequate. *United States v. Sanchez*, 790 F.2d 245, 253 (2d Cir. 1986).

Under the second prong, a defendant must meet the "heavy burden" of showing "actual prejudice." *Williams v. Taylor*, 529 U.S. 362, 394 (2000). To satisfy the prejudice prong, the defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A defendant cannot establish prejudice by merely showing that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693. Only where both prongs of the *Strickland* test are satisfied can it be concluded that "counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Id.* at 687.

## **ARGUMENT**

The Court should deny Jones' Petition. The Government did not suppress exculpatory information, and Jones' claim to the contrary is barred by his plea agreement. Jones' ineffective

assistance of counsel claim fails because it is untimely; he did in fact receive effective assistance of counsel; and he suffered no prejudice from any ineffective assistance. Jones' other claims are equally untimely, procedurally defaulted, and otherwise fail as a matter of substance and on their face.

### A. The Court Should Deny Jones' *Brady* Claim

Jones' *Brady* claim fails for numerous reasons, including because the information he cites is not exculpatory and because he waived any right to that information in his plea agreement. Additionally, certain of Jones' claim, based on underlying *Brady* allegations, is untimely, because he knew of the supposedly suppressed information more than a year before he filed the Petition.

#### 1. The Government Did Not Suppress Exculpatory Information

As a general matter, the Government has a "constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment," and that "duty covers not only exculpatory material, but also information that could be used to impeach a key government witness." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001). Information is exculpatory if it goes "to the heart of the defendant's guilt or innocence." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *see also Powell v. Graham*, No. 10-CV-1961 JFB, 2013 WL 37565, at *15 (E.D.N.Y. Jan. 3, 2013) (Bianco, J.) (exculpatory information is that which is "related to [the defendant's] factual guilt."). While the Government's duty to disclose favorable material includes "information that could be used to impeach a key government witness" before that witness testifies *at trial*, *Coppa*, 267 F.3d at 135, "impeachment information is special," because such information relates to the "*fairness of a trial*, not in respect to whether a plea is *voluntary*." *Ruiz*, 536 U.S. at 629 (emphasis in original). As a result, "the failure to disclose such

information prior to a guilty plea does not violate the Due Process Clause." *Friedman v. Rehal*, 618 F.3d 142, 153 (2d Cir. 2010).

Jones cites, as the purportedly exculpatory evidence that the Government withheld, "civil, criminal, and Internal Affair Division actions that had been filed against detectives who were actively investigating defendant," (Dkt. No. 23 at 6–7), namely the false statements by Detective Fogarty in the Calvin Powell case (Dkt. No. 23 at 8); allegedly false statements made by Detective Santos in property inventory notices in the Powell case (Dkt. No. 23 at 8–10); and complaints made against Detective Antonini in numerous cases in Mount Vernon in which he allegedly has violated defendants' rights. (Dkt. No. 23 at 13–14).

**(a) Information Concerning Calvin Powell search**

At the outset, the Government notes that it learned of allegations against Detective Fogarty concerning the Calvin Powell search in October 2018, shortly before charges were filed in this case. The Government also learned at that time that Detective Santos and other members of the Westchester DEA Task Force, including Agents Maher and Tamweber, were involved in the Calvin Powell search, but was not aware of any allegation of misconduct against Detective Santos relating to that search until after Powell filed his civil suit against her on December 11, 2019 (the day before Jones's sentencing in this case).[39]

---

[39] The Government understands that in his civil suit, Calvin Powell has filed an amended complaint naming Agents Maher and Tamweber as defendants. *Powell v. United States of America*, 19 Civ. 11351, Dkt. No. 81. Additionally, the Government understands that other members of the surveillance teams involved in the controlled buys from Jones were present at the Powell search in April 2018.

With respect to the information regarding Detectives Fogarty, Santos, and the other members of the Westchester DEA Task Force involved in both the Calvin Powell search and the operations against Jones, this information is obviously collateral impeachment material, not exculpatory information. Jones admits that he would have used the supposedly suppressed information "to impeach detectives and attack the search warrant and supporting affidavit, non-disclosure prevented defendant from conducting an investigation leading to additional evidence, namely that other detectives and police officers involved with the investigation of the defendant were also named in two or more civil actions that had been brought" against Detective Antonini and other members of law enforcement. (Dkt. No. 23 at 14). Neither Detectives Fogarty nor Santos (nor, for that matter, Agents Maher or Tamweber) swore to any search warrants against the defendant; thus, as he admits, he would only have used this information to "impeach" them.

Of course, neither Detectives Fogarty or Santos, or any other law enforcement officer, could have been impeached, because the Government did not call anyone to testify against Jones; he pleaded guilty before a motions deadline was even set, pursuant to a plea agreement with a *Brady* and *Giglio* waiver. Information about the detectives' respective roles and actions in the Calvin Powell search is wholly unrelated to Jones' "factual guilt," *Graham*, 2013 WL 37565, at *15, and instead could *only* have been used "to discredit" each as "a witness," and "to reduce the effectiveness of [their] testimony by bringing forth evidence which explains why the jury should not put faith in her or her testimony"; in other words, it was impeachment evidence. *Rehal*, 618 F.3d at 153 (citations omitted). Critically, Jones never denies that he sold narcotics to the undercover; such testimony would not be credible, in any event, given his failure to object to the

statements in the PSR to that effect. Indeed, neither Detective Fogarty nor Detective Santos were particularly essential witnesses in this matter: as described above and in the DEA reports that Jones appends to the Petition, Fogarty and Santos were only part of a much larger team of law enforcement agents who observed or participated in the controlled buys from Jones on July 26, 2018, August 3, 2018, and August 8, 2018. (Dkt. No. 23-2 at 14–20). The undercover officer could of course have himself testified to his observations of Jones' sales; and any testimony by any law enforcement witness would have been further corroborated by, among other things, video recordings by law enforcement officers in the vicinity who recorded Jones meeting with the undercover officer. Indeed, Mr. Gold made precisely this point in his January 24, 2020 letter to Jones: "I examined the discovery from your case, and it does not appear that Officer Fogarty was very involved in your case." While Detective Santos played a larger role in the investigation into Jones, since she participated in the controlled buys, helped execute the search warrant on Jones' apartment on November 26, 2018, and swore to the criminal complaint charging Jones, among other things, she also would not have been a critical witness given the large number of officers who participated in the controlled buys, the video recordings of the buys, and the numerous officers (Sergeant Reitter, Detective McClendon, and Detective Lee, Dkt. Nos. 23-6 at 9–11) who participated with her in the search of Jones' residence.

Had the Court set a trial date and had the Government called any law enforcement officers, then the Government would have made appropriate disclosures before their testimony.[40] But the defendant pleaded before the Court had even set a motions date, let alone a trial date, and therefore was not entitled to any impeachment information. *Ruiz*, 536 U.S. at 629.

**(b) Information Concerning Detective Antonini**

With respect to the allegations currently lodged against Detective Antonini by members of the public and in civil suits, while the allegations are serious, they are similarly impeachment material, and are not exculpatory. At the outset, we note that the Government was unaware of any allegations of misconduct against Detective Antonini until the publication of the newspaper articles Jones cites in the summer of 2020. Further, even if all the allegations against Detective Antonini are true, they go to his credibility, unrelated to whether Jones committed the crimes charged in the Indictment; even now, Jones does not dispute that he committed those crimes. Nor, as discussed below, would Jones prevail on a *Franks* motion even had all of this later-discovered information concerning Detective Antonini been available to him at the time of his plea.

Indeed, the allegations against Detective Antonini are not subject to a *Brady* analysis *as to Jones* for a further reason: Jones "knew, or should have known" about the supposed inaccuracies he cites in the search warrant during the pendency of his case. *Payne*, 63 F.3d at 1208. He himself knew about his own interactions with the person deemed a confidential informant mentioned in

---

[40] The Government notes that while Detective Fogarty pleaded guilty to a crime, there have been no charges against Detectives Santos. As to Detective Santos, at least, the civil suit filed by Powell is still pending, and there has been no finding that she committed any misconduct.

the search warrant affidavit that he now disputes[41]; he knew about the circumstances of his prior arrest[42]; he knew the circumstances of his stop by Mount Vernon police that he now disputes[43]; and he knew or should have known about the conversations between his brother and a confidential informant, given his brother's filing of a factual affidavit, that he now disputes.[44] It is these alleged inaccuracies, not Detective Antonini's general credibility, that would have been the basis for Jones to "attack the search warrant and supporting affidavit," (Dkt. No. 23 at 14). *See United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000) ("[t]o suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: '(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth . . . "). Despite his knowledge about the putative facts in his Petition at the time his case was pending, Jones made no motion to suppress the fruits of the search warrant, and by definition, this information, which is the relevant material in support of his defense, was not suppressed from him. *Payne*, 63 F.3d at 1208.

**2. Jones Waived His Right to Attack His Conviction**

Through his plea agreement and allocution, Jones waived his right to attack his conviction based on supposed suppression of *Brady*, *Giglio*, Jencks Act, or Rule 16 information. Ex. A at 8. He told Judge Smith, under oath, that he understood the "entire plea agreement," which included

---

[41] Dkt. No. 23-1 at 2–6.

[42] Dkt. No. 23-1 at 6–8.

[43] Dkt. No. 23-1 at 8–10.

[44] Dkt. No. 23-1 at 10–15.

the waiver. (Plea Tr. at 11); *see also id.* at 21–22 (Jones told Judge Smith he understood that through his agreement, he was "giving up other rights that you might have had to appeal or otherwise attack the sentence imposed by the Court."). That knowing waiver precludes any attack on his guilty plea based on purportedly suppressed disclosure material. *See Colon*, 2019 WL 5078600, at *2; *Tremblay*, 2009 WL 1055007, at *8. While there is a carve-out provision in the plea agreement for ineffective assistance claims, that provision would only cover the defendant's claim that his counsel was ineffective for failing to ask for *Brady* material; it does not apply to the defendant's substantive argument that he was denied *Brady* material.[45] *Accord United States v. Scott*, 552 F. App'x 838, 839–40 (10th Cir. 2014) (denying post-plea habeas petition despite Government's failure to disclose information about officers who had allegedly "routinely manufactured evidence, and lied on the witness stand").

The Government has found, and brings to the Petitioner and the Court's attention, one case that overturned a conviction in an analogous but fundamentally distinguishable circumstance. In the investigation underlying *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013), a DEA Task Force Officer applied for a search warrant for the defendant's residence and vehicle. *Id.* at 462. The TFO stated that he had learned from a confidential informant that the defendant dealt drugs from his residence and vehicle and had a gun in his residence. *Id.* The TFO described the confidential informant as a reliable informant who had previously provided him with information that led to numerous arrests for narcotics violations, and stated that the informant had provided

---

[45] The Government addresses Jones' ineffective assistance claim in further detail below.

various corroborative information and had identified the defendant; the TFO also stated that he had conducted surveillance and saw the defendant make narcotics sales from the car and soon after return to the residence. *Id.* at 462–63. When the TFO and other agents executed the search warrant, they found a gun and drugs. *Id.* at 463. The defendant then pleaded guilty to being a felon-in-possession. *Id.* More than a year later, the TFO was charged with fraud and theft and other offenses. *Id.* When the TFO pleaded guilty, he admitted that the confidential informant he had identified in his affidavit in support of the warrant for Fisher's residence and car "had no connection to the case" and that another individual was "the real informant." *Id.* The Fourth Circuit majority ultimately overturned the defendant's conviction, holding that because the TFO's misrepresentation underpinned the Government's entire case, and had the defendant known of the TFO's lies "he would have filed a motion to suppress, and the motion may well have been successful," the defendant's plea was involuntary. *Id.* at 465, 467.

However, *Fisher* is clearly distinguishable.[46] First, unlike in *Fisher* and notwithstanding Jones' allegations, Jones has not established that *any* law enforcement officer acted inappropriately in *his* case. Second, and as described further below, there is no basis to conclude that *any* of Jones' claims of misconduct would have led to a successful suppression motion: Detectives Santos and Fogarty simply observed controlled purchases of narcotics, and those observations (corroborated as they were by other law enforcement officers and video recordings) could not have been subject to suppression; and there is no basis to conclude that Jones' motion to suppress Detective

[46] *Fisher* also included a lengthy dissent. 711 F.3d at 470–478 (Agee, J., dissenting).

Antonini's affidavit would have been successful. Finally and most importantly, the TFO in *Fisher* made misstatements that the defendant could not have known about independently; Jones, by contrast, knew or should have known about all the allegedly false statements in Detective Antonini's affidavit at the time his criminal case was pending, and nonetheless made no motion to suppress the search warrant. By definition, then, any "misconduct" could *not* have "induced him to plead guilty." *Id.* at 467.

**3. Jones' *Brady* Claim as to Certain Allegations is Untimely**

The Court should also dismiss certain of Jones' allegations regarding his *Brady* claim as not timely. *Guerrero*, 2021 WL 3172985, at *3 ("one-year statute of limitations operates on a claim-by-claim basis."). The Court entered judgment in this case on December 12, 2019. Jones did not file a notice of appeal, so his conviction became final fourteen days later on December 26, 2019. *Robinson v. United States*, 2021 WL 568171, at *3. The one-year statute of limitations for Jones' *Brady* claim possibly commenced on "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). According to Jones' own filings, he knew about the criminal conduct of Detective Fogarty, and allegations about the conduct of Detective Antonini, by no later than late January 2020. Mr. Gold mailed Jones a letter dated January 24, 2020, which described Detective Fogarty's guilty plea for his criminal conduct in relation to the Calvin Powell case, and described certain allegations which had been made into Detective Antonini.[47] When Jones received that letter, the

[47] Even if the somewhat generalized allegations against Detective Antonini referenced by Mr. Gold are insufficient to trigger the statute of limitations, the more detailed allegations in the article appended to Jones' Petition (Dkt. No. 23-3 at 18–31), the printout of which is dated June 23, 2020,

purportedly exculpatory facts he now references no longer "could have been discovered"; he actually knew those facts as of that date. Nonetheless, he did not file the Petition until over a year later, July 21, 2021, and thus Jones has not met his burden to establish that his *Brady* claim is timely.

Jones offers no reason to conclude otherwise. The Second Circuit has recognized that, in certain circumstances, a habeas petitioner can bring their untimely claim under "equitable tolling," "if he shows: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *United States v. Wright*, 945 F.3d 677, 684 (2d Cir. 2019) (citing *Holland v. Florida*, 560 U.S. 631, 645 (2010)). The Government agrees that "the COVID-19 pandemic could—in certain circumstances—conceivably warrant equitable tolling." *United States v. Haro*, No. 8:18CR66, 2020 WL 5653520, at *4 (D. Neb. Sept. 23, 2020). But equitable tolling is only appropriate if the petitioner "has been pursuing his rights diligently." *Wright*, 945 F.3d at 684. Jones has not provided evidence that he did so. *See Hines v. United States*, No. 17-CR-364-2 (CS), 2021 WL 2456679, at *3 (S.D.N.Y. June 16, 2021); *Howard v. United States of America*, No. 4:20-CV-1632 JAR, 2021 WL 409841, at *3 (E.D. Mo. Feb. 5, 2021) (denying equitable tolling for petitioner's failure to demonstrate diligence); *United States v. Barnes*, No. 18-CR-0154-CVE, 2020 WL 4550389, at *2 (N.D. Okla. Aug. 6, 2020) (same).

---

are the sum of Jones' claim that Detective Antonini has committed misconduct, and thus definitionally triggered the commencement of the statute of limitations.

To the contrary, Jones has not established that he pursued his rights diligently. There is no indication in the record about why Jones did not file a petition based on the putatively suppressed information about Detective Fogarty for 18 months after he learned of Detective Fogarty's guilty plea, or 13 months after he indisputably learned of the allegations against Detective Antonini. He states that he needed "to wait 50 days to receive legal document[] from New York" and there were limitations on the law library due to Covid restrictions, (Dkt. No. 23-1 at 31), but neither of these are sufficient as a basis for equitably tolling under 2255. *See Morales v. Bradt*, No. 11-CV-329, 2013 WL 600176, at *4 (W.D.N.Y. Feb. 11, 2013) ("courts have held that lack of access to legal materials or papers does not constitute an extraordinary circumstance that warrants equitable tolling") (collecting cases); *Cross v. McGinnis*, No. 05-CV-504, 2006 WL 1788955, at *6 (S.D.N.Y. June 28, 2006) ("restricted access to library facilities does not merit equitable tolling,"); *Francis v. Miller*, 198 F. Supp. 2d 232, 235 (E.D.N.Y. 2002) ("limited access to legal assistance" does not warrant equitable tolling). Fundamentally, Jones does not explain why he did not file his Petition with the information he did have, or how his situation was distinguishable from many of his fellow prisoners who filed a flurry of compassionate release applications in the midst of the pandemic. *See Hines*, 2021 WL 2456679, at *2; *United States v. Shumate*, No. 18-CR-0645, 2021 WL 1851849, at *2 (D.N.J. May 7, 2021); *contra United States v. Mayfield*, No. 4:16-CR-3077, 2021 WL 826577, at *1–2 (D. Neb. Mar. 4, 2021) (finding diligence and granting equitable tolling for defendant who twice filed motions during the statutory period requesting extension of statute of limitations because of the COVID-19 pandemic, and then filed an initial timely petition followed by a later, supplemental,

untimely petition). Jones "points to no reason why he could not have filed a petition – even a bare-bones one – and then asked for additional time to supplement it." *Hines*, 2021 WL 2456679, at *2.

Thus, there is no "causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing." *Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001) (citing *Valverde*, 224 F.3d at 134). The Court should dismiss the *Brady* claim as to Fogarty and Antonini as untimely.

**B. Jones' Ineffective Assistance of Counsel Claim is Untimely and Without Merit**

In a passing statement, Jones asserts that Ms. Brody acted ineffectively by failing to perform a reasonable investigation, filings motions and briefs, timely communicating any and all guilty plea offers, and interviewing witnesses. (Dkt. No. 23-1 at 23). Jones provides details about only one area where he claims Ms. Brody acted ineffectively: that she failed to file suppression motions.[48] This claim is obviously untimely. Even if the Court were to consider it, Ms. Brody provided effective assistance of counsel because any such motion would have been denied, and Jones suffered no prejudice, because he obtained a highly favorable result given his initial sentencing exposure.

---

[48] Jones offers no other basis to believe Ms. Brody acted ineffectively with respect to failing to file any other type of motion, or failing to investigate, or failing to interview witnesses, or how her supposedly unreasonable performance in those areas prejudiced him. To the extent the Court believes Jones' facts do not, on their own, merit dismissal, the Government respectfully requests that the Court provide Jones an opportunity to waive his attorney-client privilege so Ms. Brody can submit a declaration with her testimony about her representation. With respect to Jones' apparent assertion that Ms. Brody did not timely communicate all plea offers, the Court can dismiss that out of hand: the Government made one written plea offer to Jones, the one he accepted soon after the Government sent it to Ms. Brody.

**1. The Ineffective Assistance of Counsel Claim is Untimely**

There is no basis for Jones to excuse his July 2021 claim of ineffective assistance of counsel, more than 18 months after judgment was entered. Jones cites to facts that were well within his own knowledge as of the day of his arrest. (Dkt. No. 23-1 at 8–10) (Jones' version of the circumstances of the November 24, 2018 stop); (Dkt. No. 23-1 at 10–15) (Jones' description of conversations between himself and his brother Derrick Crenshaw, and Crenshaw's subsequent conversations with a confidential informant). That means Jones' habeas petition was due within one year of the entry of judgment, December 12, 2020. As described above, his assertion that he could not file *any* petition before July 2021 because of COVID-19 is simply insufficient as a matter of law. *Hines*, 2021 WL 2456679, at *2.

**2. Jones Has not Shown Ms. Brody Acted Ineffectively By Not Filing Motions to Suppress**

The burden rests on the petitioner to show that filing a motion to suppress would have been meritorious. *See United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990); *Laaman v. United States*, 973 F.2d 107, 113 (2d Cir. 1992) ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the [defendant] must also prove that his Fourth Amendment claim is meritorious . . . "). Reading his Petition most favorably, the Government construes Jones' argument to be that Ms. Brody should have filed a motion to suppress the gun seized from him on November 24, 2018, because the stop was unconstitutional; and the evidence seized from his apartment on November 26, 2018, because Detective Antonini's affidavit contains false statements. (Dkt. No. 23 at 17, 35) (in the section captioned "Brady Violation, Civil Rights Violations, Pursuant to the 4th, 5th, 6th, and 14th

Amendments of the Constitution," asserting that Ms. Brody "expressed the need" to suppress that evidence, but "never filed a motion in court.")[49]

**a. No Motion to Suppress Evidence Obtained at the Time of His Arrest Would Have been Meritorious**

With respect to the November 24, 2018 arrest, Jones disputes at some length whether the Mount Vernon Police Department had already arrested an individual for burglary, before officers had stopped Jones as a possible suspect of that offense. (Dkt. No. 23 at 18–22, 24–25). Though his filing is somewhat hard to parse, he does not seem to dispute that he was "still in possession of his cellphone, in his left hand conceiling [sic] the alleged marijuana cigarette allegedly laced with PCP." (Dkt. No. 23 at 23–24). Jones' possession of a marijuana cigarette, standing alone, justified an arrest by the Mount Vernon Police Department. *United States v. Cuevas*, No. 15-CR-846 (PKC), 2016 WL 2766657, at *3 (S.D.N.Y. May 12, 2016) ("Even if an officer has probable cause to believe that an individual has committed only a minor criminal offense in his presence," including various minor marijuana offenses, "he may, without violating the Fourth Amendment, arrest the offender.") (citation omitted).[50] According to his statements in his own filing, after he

[49] Jones' Petition raises these issues as if he can do so directly, Dkt. No. 23 at 17–37 (with respect to the gun seized from his person on November 24, 2018), Dkt. Nos. 23 at 40, 23-1 at 1–19 (drugs and gun seized from the apartment on November 26, 2018). Of course, and as described herein, he cannot, because he failed to raise them in his direct case and then filed no appeal, so he has procedurally defaulted this argument.

[50] Marijuana has now been decriminalized in New York state, but as of November 24, 2018, it was still an "offense" subject to arrest under New York law. *United States v. Sayles*, No. 1:19-CR-186RJA (MJR), 2021 WL 3195016, at *15 (W.D.N.Y. May 6, 2021) (upholding legality of arrest of individual based on possession of marijuana, as of August 2019), report and recommendation adopted, No. 19-CR-186-A, 2021 WL 3191886 (W.D.N.Y. July 28, 2021).

was lawfully arrested, he told the officers "he was in possession of a handgun in his right breast pocket," (Dkt. No. 23 at 23), which would have been seized incident to arrest regardless. Thus, any motion to suppress the gun seized November 24, 2018 would have been meritless.[51]

**b. Jones Would Have Had No Meritorious *Franks* Motion Concerning the Search of his Apartment**

The same is true of the search of Jones' apartment on November 26, 2018. Jones has cited to very serious assertions regarding Detective Antonini's conduct in other cases. But in order to suppress the evidence seized pursuant to the warrant executed on November 26, 2018, Jones needed to show more. "A search warrant affidavit is presumed reliable." *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008); *see Franks v. Delaware*, 438 U.S. 154, 171 (1978) ("There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant."). Under *Franks*, "[t]o suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: '(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding."' *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000) (citing *Franks*, 438 U.S. at 164–172). The burden is on the defendant, to show by a preponderance of the evidence, both materiality and intent. *See Klump*, 536 F.3d at 119; *see also United States v. Falso*, 544 F.3d 110, 128 (2d Cir. 2008) (rejecting *Franks* motion because defendant "has not met his burden of demonstrating that" the agent "made the alleged misrepresentations and that he omitted material information

---

[51] And of course, as described below, Jones could not have suffered any prejudice by the lack of motions as to this gun, because he did not plead guilty to possessing it.

knowingly or recklessly."). And even if material false statements are included in a warrant affidavit, the Court should only suppress the fruits of the search pursuant to that warrant if, after "disregard[ing] the allegedly false statements," the Court determines that "the remaining portions of the affidavit" do not support probable cause to issue the warrant. *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (citations omitted).

Detective Antonini's November 26, 2018 affidavit contains five factual paragraphs supporting probable cause, (Dkt. No. 23-6 at 3–4), but the Court need only review two which Jones does not dispute to conclude that, even after striking the other paragraphs, "the remaining portions of the affidavit" support a finding that there was probable cause to search Jones' apartment for drugs. *Awadallah*, 349 F.3d at 64. In the first paragraph, Detective Antonini attests that over the "3 months" after "June of 2018," law enforcement officers "made 6 purchases of heroin from Darrell Jones," in the vicinity of 40 East Sidney Avenue. According to the affidavit, "[o]n five of the buy occasion's [sic] surveillance teams observed Darrell Jones entering and leaving the building located at 40 East Sidney immediately prior to meeting the Undercover Officer." (Dkt. No. 23-6 at 3). Jones does not deny this allegation; instead he complains that the information was "4 months old" and that the investigation involving the controlled purchases "ended on or about August 8, 2018." (Dkt. No. 23-1 at 2). In the final factual paragraph supporting probable cause, Detective Antonini states that various internal law enforcement databases show that Jones resides

at 40 East Sidney Ave, Apt. 10N. (Dkt. No. 23-6 at 4).[52] Those two facts, alone, were sufficient to support a search of Jones' apartment: just a few months before the affidavit, Jones sold drugs in the vicinity of 40 East Sidney Avenue, on numerous occasions being observed entering or leaving that building right before selling narcotics, and Jones lived at that apartment. *Scott v. United States*, No. 12-CR-909 (KMK), 2019 WL 6034973, at *5 (S.D.N.Y. Nov. 14, 2019) (rejecting suppression motion-based habeas petition in narcotics case when "the search warrant affidavit described numerous" controlled buys from a residence *ten months* before search warrant sought, because "[i]n investigations of ongoing narcotics operations," "intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale.") (citing *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991)); *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990) ("Given the continuous nature of narcotics conspiracies ... the approximately 18–month delay between procuring the informants' statements and seeking the wiretap warrant did not render the information stale."). Thus, assuming *arguendo* the Court found Antonini's other statements false, and material, there remained ample probable cause to issue the warrant.

This conclusion is further buttressed by Detective Antonini's citation to Jones' arrest on November 24, 2018, in possession of what was believed to be a marijuana cigarette and firearm, which indicated that Jones continued to commit similar criminal conduct just two days before the

[52] The Court can see this itself from the documents Jones attaches: the 2015 police reports which Jones cites (Dkt. No. 23-7 at 2–9) gives his residence as the Apartment (*id.* at 3, 7, 9), and the November 24, 2018 arrest report by the Mt. Vernon PD does the same (Dkt. No. 23-5 at 15).

warrant issued, and refreshing the information in the search warrant.[53] *See, e.g. United States v. Becerra*, 97 F.3d 669, 671 (2d Cir. 1996) ("drug dealers commonly keep firearms on their premises as tools of the trade.").[54]

Jones has thus not met his burden of showing that any suppression motions filed by Ms. Brody would have been successful: in fact, as described above, such motions would have failed. At best, had she filed such motions, "[p]erhaps [Jones] would have prevailed, perhaps not." *Davis v. United States*, No. 18 CV 1308 (VB), 2019 WL 3429509, at *5 (S.D.N.Y. July 30, 2019). But the decision to forego such motions in favor of a favorable plea, "which, of course, took into consideration many other factors, such as the benefit of being sentenced after a guilty plea pursuant to a plea agreement in which the government agreed to accept a plea to a lesser-included offense [] and drop other counts, rather than after a conviction at trial—was not incompetence under prevailing professional norms." *Id.* (citing *Strickland*, 466 U.S. at 690).

---

[53] If the Court had found the Mount Vernon PD's stop of Jones on November 24, 2018 illegal, then this paragraph would have been suppressed as fruit of the poisonous tree.

[54] The Court need not consider the other factual assertions in Detective Antonini's affidavit. But Jones suggests, incorrectly, that the Government has or should have recorded calls of his conversations with his brother Derrick Crenshaw, which could be reviewed to determine the truth of Detective Antonini's statement that a confidential informant told Antonini that Crenshaw had relayed to the informant a conversation Crenshaw had with Jones while Jones was incarcerated. (Dkt. No. 23-1 at 15) ("All calls at the Westchester County Department of Correction are recorded and subject to being monitored"). The Government does not have such calls; and more broadly, the Government understands that at least as of 2018, the Westchester County Jail telephone system does not allow for production of telephone calls to and from a specific inmate or individual; instead, the jail must be provided with date(s) of interest and number(s) dialed.

### 3. Jones Suffered No Prejudice from Ms. Brody's Representation

Even assuming the Court were to entertain Jones' assertion that Ms. Brody should have filed suppression motions, he cannot show he was prejudiced by that failure to file. In exchange for foregoing motions and other litigation, Ms. Brody negotiated on Jones' behalf to obtain a particularly favorable plea agreement.

As described in the statement of facts, when indicted, Jones faced charges based on three separate incidents: first, Counts Three and Four, the narcotics sales on July 26 and August 3, 2018; second, Count One, the firearm he was arrested with on the streets of Mount Vernon on November 24, 2018; and third, Counts Two, Five and Six, the drugs and firearm found in his apartment on November 26, 2018. Because of Jones' lengthy criminal history, he faced dozens of years in prison. The Government's *Pimentel* letter lays out his exposure: were he to plead guilty to all of the counts in the indictment, besides Count One, he would have faced a mandatory minimum of 240 months' imprisonment, and a Sentencing Guidelines range of 262 to 327 months' imprisonment. Had he gone to trial and lost, he would have faced the same mandatory minimum, but with a Guidelines range of 360 to life. U.S.S.G. § 4B1.1(c)(3) ("Guideline Range for the 18 U.S.C. § 924(c) or § 929(a) Count(s)" with no reduction for acceptance of responsibility). Jones' problems were amplified by the different types of evidence the Government had for each of the categories of offenses: assuming Jones *had* successfully moved to suppress both the firearm seized from his person on November 24, 2018,[55] *and* the results of the search warrant executed on the

[55] Indeed, Ms. Brody successfully negotiated a plea agreement where Jones did not plead to his possession of that firearm, so by definition he suffered no prejudice by her failure to move to suppress that gun.

Apartment on November 26, 2018, he *still* could not have moved to suppress the controlled narcotics purchases from July 26 and August 3, 2018, and his only alternative would be to win at a jury trial.

His sentencing exposure after a criminal conviction for those narcotics sales would also have been tremendously high on their own: 210 to 262 months', because he was a Career Offender. U.S.S.G. § 4B1.1(b)(3) (offense level 32, Criminal History Category VI, for a Career Offender convicted of violations of narcotics offenses that carry a statutory maximum of 20 years or more but less than 25 years). Additionally, at such a sentencing, the Court would have considered the suppressed evidence, which would have further increased Jones' sentencing exposure. *United States v. Tejada*, 956 F.2d 1256, 1263 (2d Cir. 1992) ("[S]entencing judges must consider relevant illegally seized evidence," unless "officers obtained evidence expressly to enhance a sentence").

While Ms. Brody did not file a suppression motion, as part of the negotiated plea the Government agreed to dismiss the charge based on the gun seized from Jones on November 24, 2018, and instead of the outcomes he faced had he lost a suppression motion and at trial, a Guidelines range of 360 months' to life with a 20 year mandatory minimum, Ms. Brody negotiated a plea agreement where Jones faced just a 10 year mandatory minimum and received points for acceptance of responsibility. Given that "[e]ven if [he] had succeeded on the suppression motion" "the Government still had significant evidence against him," Jones was not prejudiced by his decision with the assistance of counsel not to file a suppression motion. *United States v. Castillo*, No. 18 CR. 404 (PAC), 2020 WL 1151471, at *5 (S.D.N.Y. Mar. 9, 2020); *see also Premo v. Moore*, 562 U.S. 115, 124 (2011) ("Plea bargains are the result of complex negotiations suffused

with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks.")

### C. Jones' Other Claims are Untimely and Meritless

The remainder of Jones' other claims are untimely and meritless.

First, Jones directly raises suppression-related challenges to the gun seized from his person on November 24, 2018 and the evidence seized from his apartment on November 26, 2018. Those arguments were raised for the first time far more than 12 months after this Court entered judgment, and so are untimely. The claims were also not properly presented to this Court on his direct case, and Jones filed no appeal, so the argument is procedurally defaulted. *Yick Man Mui,* 614 F.3d at 53. Finally, as described above, Jones' challenges have no merit, and the Court should deny his motion on that basis.

Second, Jones asserts that, in some way, the Government committed misconduct because it should have "properly instruct[ed] the members of the Grand Jury that 3 separate cases w[ere] being presented before them, rather then all 3 cases being presented to the Grand Jury as one individual case that was developed from one investigation." (Dkt. No. 23-1 at 20–21). The Government is unsure what this argument means; nonetheless, Jones has known about the Indictment's structure since the grand jury issued the indictment in January 2019 so any habeas petition on this basis would be untimely; he did not raise the issue before this Court or on appeal so the issue is procedurally defaulted; and finally, the issue is meritless, because the Indictment on its face shows that the Government properly instructed the grand jury about the different investigations which involved Jones since the grand jury charged Jones for different crimes.

Finally, Jones challenges the "legality of the chain of custody" of drug evidence. This issue, which he has known about since the Government produced discovery, is untimely and procedurally defaulted. The issue is also meritless: Jones questions only the "whereabouts of the 30 grams of heroin . . . concerning this drug evidence from August 8, 2018," (Dkt. No. 23-1 at 28), but as the lab report he himself possesses makes clear, the lab determined this was not narcotics at all, a fact which the Government specifically described to Probation at sentencing. (PSR ¶ 10) ("On a third occasion, JONES sold what he represented to be heroin, although it was determined to be fake."). To whatever extent the Court considers this argument on its merits as to the other controlled purchases, it should be rejected: any "break in the chain of custody does not necessarily result in the exclusion of the physical evidence." *United States v. Gelzer*, 50 F.3d 1133, 1141 (2d Cir. 1995). That means that even if law enforcement "went outside the chain of custody" – and Jones offers no evidence of such an assertion – the narcotic evidence would have still been admissible against him at trial.

## CONCLUSION

The Court should deny the Petition, because the Government did not suppress exculpatory information from him, he received effective assistance of counsel, and his claims otherwise are untimely, procedurally defaulted or fail on their merits.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: __________/s/__________________
Samuel Raymond
Assistant United States Attorney
(212) 637-6519